## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Elizabeth A. White, Special Agent ("SA") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search for and seizure of electronically stored information and other physical evidence, as particularly described in Attachment B, within a white 2022[1] Ford F-150 bearing vehicle identification number ("VIN") 1FTEW1EB4NKE55854, currently located in Kansas City, Missouri (hereinafter the "**Target Vehicle**"), a description of which is contained in Attachment A. I am seeking evidence related to violations of 18 U.S.C. § 922(u), that is, knowing theft of firearms from a federal firearms licensee; and 18 U.S.C. § 922(j), that is, receipt or possession of a stolen firearm.

2.     I have been a SA with ATF since November 2016. I have received basic Criminal Investigative Training and Special Agent Basic Training at the Federal Law Enforcement Training Center located in Glynco, Georgia. I am currently assigned to ATF Kansas City Group V. My duties include the investigation of violations of federal firearms and controlled substance laws occurring within the Western District of Missouri. Prior to my current assignment, I was assigned, as a SA, to the ATF Memphis Field Office. I was also previously employed as an Intelligence Research Specialist with ATF, in Kansas City, Missouri, for approximately two years. Before working for ATF, I was a Military Intelligence Analyst for the United States Army for 10 years. I have a master's degree in Psychology from Troy State University.

---

[1] Police reports appear to incorrectly list a different model year for the **Target Vehicle**, but a VIN lookup indicates that it is model year 2022.

1

3.      In connection with my official duties, I investigate criminal violations, to include, without limitation, 18 U.S.C. §§ 922(u), 924(i)(1), and 2. I have received specialized training in the investigation of federal firearms licensee burglary and robberies, criminal street gangs including asset seizure and forfeiture, document and media exploitation, the use of phone and tracker technologies, case development and management, interview and interrogation techniques, informant development, Title III training, and the use of electronic surveillance. During my law enforcement career, I have become familiar with gang members' methods of operation, including gang organization structure, methods of violence, distribution, storage, and transportation of controlled substances, and how firearms are obtained and transported. I have also learned how gang members transmit information to one another, collect dues/money, and launder money, and their methods of conducting surreptitious meetings and communications. I am personally familiar with, or have used, all normal methods of investigation throughout my career including, but not limited to, visual surveillance, electronic surveillance, informant and witness interviews, social media analysis, undercover operations, and Title III/wiretap investigations. Specifically, as an ATF SA, I have attended Office of Enforcement Operations Title III training and assisted in three separate wiretap investigations.

4.      The facts in this affidavit are based on my own investigation and information provided to me by other law enforcement officers. Because this affidavit is submitted for the limited purpose of establishing probable cause to search the location further described in Attachment A for the items listed in Attachments B, not all of the information known to me about this investigation has been included in this affidavit.

5.      Based upon the facts set forth herein, I have probable cause to believe that a search of the **Target Vehicle** will lead to evidence of violations of 18 U.S.C. §§ 922(u) and 922(j), as

2

well as the identification of individuals who are or have been engaged in the commission of those crimes.

## PROBABLE CAUSE

**A.     Suspects Burglarize FFLs in Basehor and De Soto, Kansas**

6.      On October 16, 2022, at approximately 12:40 a.m., the Basehor, Kansas Police Department responded to a possible commercial burglary at Free State Gun Company located at 14500 Parallel Road, Basehor, Kansas. Free State Gun Company holds a federal firearms license ("FFL"). When officers arrived, they observed the front door of the business destroyed, allowing officers to enter the structure. When they entered the building, they observed glass display cases broken and numerous firearms missing.

7.      The business owners were alerted by an alarm system and responded to the store. When the owners arrived, they were able to confirm numerous firearms were stolen. After reviewing their inventory, the owners confirmed approximately 48 firearms were missing, to include rifle platforms, shotguns, and pistols.

8.      Surveillance cameras were installed inside and outside of the business and turned over to law enforcement. The video from within the store revealed a white in color Ford F-150— believed to be the **Target Vehicle**—backed up to the front of the business. The door appeared to be destroyed from the truck. At approximately 12:31 a.m., three individuals entered the business and were observed breaching another door leading the suspects into the main firearms display room. Once inside the room, the three suspects broke the display glass and began carrying firearms from the building to the **Target Vehicle**. All three suspects appeared to be wearing face coverings, head garments, sweatpants, and long sleeve hoodies. Two of the suspects appeared to be tall and one may have been wearing a pair of glasses. One of the three suspects was not wearing gloves and

3

appeared to be a black male. After approximately two minutes, the three suspects exited the front of the business and are believed to have fled east on Parallel Road.

9.      On October 17, 2022, at approximately 5:00 a.m., deputies with the Johnson County, Kansas Sheriff's Office responded to an alarm or possible burglary at Up in Arms guns store located at 33490 Lexington Avenue, #F, De Soto, Kansas. Up in Arms holds an FFL. When deputies arrived, they observed the front glass door of the business destroyed. Deputies entered the gun store and observed glass display cases broken and numerous firearms missing.

10.     The business owners were alerted and responded to the store. When the owners arrived, they were able to confirm numerous firearms were stolen. After reviewing their inventory, the owners confirmed 25 pistols were taken.

11.     Surveillance cameras were installed on both the interior and exterior of the business. The owners of Up in Arms turned the video over to law enforcement. The exterior video showed a white Ford F-150, believed to be the **Target Vehicle**, pull into the parking lot around 4:57 a.m. The **Target Vehicle** appeared to pull up to the front of the store and park. The rear passenger exited the **Target Vehicle**, walked up to the front door, and looked through the door before running back to the **Target Vehicle**.

12.     The **Target Vehicle** was then observed backing up to the front of the business and rammed the front glass door, causing it to break. The driver and rear passenger exited the **Target Vehicle** and entered the business. Once inside, the two suspects broke the glass display cases. The two suspects removed several handguns from the display cases and placed the firearms in the bed of the **Target Vehicle**. The two suspects are described as follows:

        a.     Suspect #1 (driver) appeared to be a tall, thin male wearing a black hoodie, tan ball cap, face covering, light colored jeans, and white and red shoes.

b. Suspect #2 (rear passenger) appeared to be a tall, thin male, wearing a black hoodie, face covering, light colored jeans and silver and black bottomed shoes.

13. Both suspects began making trips back and forth from the store to the **Target Vehicle** carrying firearms. On one occasion, Suspect #1 ran back into the store and ran directly into the front of a metal cross beam on the front door that was still intact from the breach. Suspect #1 fell backwards but was able to maintain his balance and continued to retrieve firearms. ATF believed the impact likely caused an injury to Suspect #1's face. Suspect #1's tan hat fell off his head from the impact and landed on the ground inside the store. The tan hat was solid in color with an emblem on the lower corner of the front of the hat.

14. At one point, Suspect #1 tossed a pistol from the display case out the front door toward the back of the **Target Vehicle**. The firearm struck the back rear glass of the **Target Vehicle**, causing it to break.

15. While the theft of the firearms was taking place, a third suspect wearing a white Nike hoodie was observed, on an exterior surveillance camera, sitting in the front passenger seat of the **Target Vehicle**.

16. After approximately two minutes, Suspect #1 and Suspect #2 re-entered the **Target Vehicle** and all three suspects fled the area. Exterior surveillance video captured the license plate of the **Target Vehicle**, which was 319RCZ. The registration returned to a 2003 Honda Pilot in Ottawa, Kansas. The Johnson County Crime Lab responded to the scene and began processing evidence. The tan hat that fell from Suspect #1 was photographed and collected on scene.

17. On October 17, 2022, ATF investigators responded to both scenes and began the investigation with local law enforcement. After reviewing the video surveillance, ATF agents believed both FFL thefts were committed by the same suspects. ATF Task Force Officer ("TFO")

Ryan Fincher and ATF TFO Jakob Blackman set up an alert system in hopes of tracking the **Target Vehicle** by license plate readers ("LPRs") across the Kansas City metropolitan area.

18.     LPRs are cameras set up in various intersections throughout the metropolitan area, allowing license plates to be captured via camera and saved in a database. This tool is often used by police to geographically track suspect vehicles. The LPR alerts allow law enforcement to be notified when a certain license plate is captured by the cameras.

19.     On October 17, 2022, Merriam, Kansas Detective Kristin Jasinski learned of the FFL burglaries and told members of law enforcement a possible suspect to consider was Benjamin CUSTIS. Detective Jasinski assisted in past theft investigations and knew CUSTIS was involved in a series of FFL burglaries in the past.

20.     On October 18, 2022, TFO Blackman located a Facebook profile for CUSTIS and began looking through some pictures CUSTIS had recently posted before the crimes. TFO Blackman immediately recognized numerous photographs of CUSTIS wearing and holding a tan hat. The tan hat was solid in color with an emblem on the lower corner of the front of the hat. The hat appeared to be the same hat recovered from Up in Arms on October 17, 2022.

21.     In one of the photographs posted on October 12, 2022, a person wearing light-colored jeans is depicted holding the tan hat while sitting inside a white vehicle. The photo only captured the lower half of the person. The inside of the door panel was visible in the picture and appeared to be the same as the inside of the driver's door of a Ford F-150—the same as the **Target Vehicle**.

22.     ATF agents suspected that CUSTIS may be one of the three suspects involved in the crimes. On October 18, 2022, at approximately 12:53 p.m., TFO Blackman received an LPR notification on Kansas plate 319RCZ at North 47th Street and Parallel Parkway in Kansas City, Kansas. The notification indicated the **Target Vehicle** was traveling eastbound on Parallel

6

Parkway. TFO Blackman began driving toward the area in an unmarked police vehicle. At approximately 1:14 p.m., TFO Blackman observed the **Target Vehicle** turn west on Parallel Parkway from North 31st Street. TFO Blackman relayed the information to ATF TFO Cole Massey and TFO Fincher. TFO Blackman followed the **Target Vehicle** covertly to the area of North 38th and State Avenue, Kansas City, Kansas.

23.     TFO Blackman observed the rear window of the **Target Vehicle** was wrapped in plastic, which was consistent with the rear window breaking on the white F-150 that was involved in the Up in Arms burglary the day before. The **Target Vehicle** pulled into the McDonald's drive-thru and began to order food. Members of the Kansas City, Kansas Police Department ("KCKPD") Special Operations Unit ("SOU") attempted to contact the vehicle utilizing a marked patrol vehicle in front of and behind the **Target Vehicle** as the truck was at the drive-thru window. As police officers made contact, the **Target Vehicle** reversed and struck a parked car before fleeing east on State Avenue.

24.     TFO Blackman began following the **Target Vehicle** and relayed the information. A few minutes later, aerial surveillance was able to locate the **Target Vehicle** around the 1300 block of State Avenue. ATF investigators began covertly following the **Target Vehicle** as the truck traveled out of Kansas City, Kansas and into Kansas City, Missouri.

25.     Surveillance units observed the **Target Vehicle** stopped in front of 7900 Virginia Avenue, Kansas City, Missouri for a minute or two, and saw the driver throw something into the vacant lot across the street from the residence. The **Target Vehicle** then drove around the corner and stopped near East 79th Terrace and Lydia Avenue, near another vacant lot less than 500 feet from 7900 Virginia Avenue. As undercover vehicles began to move into the area, the **Target Vehicle** accelerated rapidly and drove through residential yards east of East 79th Terrace. Members of the Kansas City, Missouri Police Department ("KCMOPD") Tactical Unit activated their

7

emergency lights and sirens; however, the **Target Vehicle** continued to flee. Officers deployed stop sticks near the East 79th Terrace and Paseo intersection. The **Target Vehicle** struck the stop sticks and continued fleeing officers at over 100 miles per hour for approximately 30 blocks. The **Target Vehicle** made several more turns before coming to a stop on East 75th Terrace.

26.     Keisean DAVIS fled from the **Target Vehicle's** right rear passenger's seat on foot. CUSTIS, the driver, and Deldrie BRYANT, the front passenger, raised their hands, but refused repeated verbal commands to get out of the car. Officers deployed a Noise Flash Diversionary Device on the **Target Vehicle's** windshield. Immediately after, both parties complied with commands and were taken into custody without further incident. DAVIS was apprehended after a foot chase in which he ran around the north side of the facility at 4500 East 75th Terrace, Kansas City, Missouri. CUSTIS had visible scabs from an injury between his eyes and on his upper lip. The injury appears to be consistent with CUSTIS striking the cross beam at Up in Arms the day before. All three suspects were transported to KCMOPD substations and interviewed. The truck was later confirmed stolen on October 10, 2022, from Laird Noller Ford in Topeka, Kansas.

27.     Numerous firearms were observed in plain view on the rear passenger floorboard of the **Target Vehicle**. Members of ATF took photographs and collected the firearms that were in plain view. They included the following firearms:

a.     A Glock brand, 48 model, nine-millimeter pistol bearing serial number BUKG086, stolen from Up in Arms in De Soto, Kansas.

b.     A Glock brand, 19 model, nine-millimeter pistol bearing serial number BWRN979, stolen from Free State Gun Company in Basehor, Kansas. An interstate nexus expert with the ATF determined this firearm was not manufactured in Kansas and so necessarily traveled in interstate commerce prior to arriving to Free State Gun Company.

8

      c.     A Free State Gun Company brand, FS-15 model, multi-caliber rifle bearing serial number 1005, stolen from Free State Gun Company in Basehor, Kansas.

      d.     A Glock brand, unknown model, nine-millimeter pistol bearing serial number BUFW970, stolen from Free State Gun Company in Basehor, Kansas.

28.     The **Target Vehicle** was towed by KCMOPD and is currently being held in Kansas City, Missouri, in the Western District of Missouri.

29.     Since ATF investigators only collected items in plain view, and CUSTIS, BRYANT, and DAVIS either fled the scene or were apprehended from the **Target Vehicle**, I believe the **Target Vehicle** may contain additional firearms, ammunition, clothing, and identification items that were not in plain view. Additionally, based on my training and experience, I believe CUSTIS, BRYANT, and Jaden CHANEY's (whose connection to this investigation is described in further detail below) DNA and latent evidence, such as fingerprints, will also be found in the **Target Vehicle**.

30.     CUSTIS was interviewed by TFO Blackman and TFO Fincher. CUSTIS was read the *Miranda* warning and provided a statement. According to CUSTIS, he purchased the **Target Vehicle** from a person a day earlier in Kansas City, Missouri, and he has never been to De Soto or Basehor, Kansas. According to CUSTIS, he was at his girlfriend's house in Osawatomie, Kansas, during the dates of the crimes and was not involved. CUSTIS also claimed he was homeless and did not know the other two individuals well and was only giving them a ride. TFO Blackman asked CUSTIS about his facial injuries and CUSTIS claimed his lip injury came from the police arrest and the scab between his eyes must have come from him being drunk or "high."

31.     BRYANT was interviewed by TFO Blackman and TFO Fincher. He was read the *Miranda* warning and invoked his right to remain silent.

32.     Following the interviews, TFO Blackman, TFO Fincher, and ATF SA Clint Westgate responded to BRYANT's residence located at 6623 Wood, Kansas City, Kansas. They contacted BRYANT's grandmother, who said that BRYANT resided at the residence with her. She went on to say he stays in the basement of her house, and she has access to the basement. TFO Blackman explained the crime being investigated to BRYANT's grandmother. BRYANT's grandmother said she had seen the white truck at her house and knew BRYANT hung around the male who usually drove the truck. BRYANT's other family members told investigators that the male who drove the white truck, believed to be the **Target Vehicle**, goes by the moniker "Lash." "Lash" is the known moniker of CUSTIS. Members of BRYANT's family had seen CUSTIS in the past and knew what he looked like. The family members confirmed the person they have seen at the house was CUSTIS and CUSTIS drove the white truck.

33.     BRYANT's grandmother signed a consent to search form for the basement, the backyard, and a shed in the backyard. TFO Blackman located a tan purse in a basement closet containing 11 pistols. All the pistols in the bag were stolen from Free State Gun Company or Up in Arms. This includes a Glock brand, 26 model, nine-millimeter pistol bearing serial number AGDE869, which was stolen from Up in Arms on October 17, 2022. An interstate nexus expert with the ATF determined this firearm was not manufactured in Kansas and, therefore, necessarily traveled in interstate commerce prior to arriving to Up in Arms. TFO Fincher located another Springfield, nine-millimeter pistol in a box on the fireplace in the basement that was reported stolen from Free State Gun Company. ATF investigators located two 5.56-caliber rifles under BRYANT's bed mattress. Both rifles were reported stolen from Free State Gun Company. ATF investigators walked around the back yard of the address and observed a pair of camouflage gloves lying on the grass that appeared new. BRYANT's family confirmed the gloves did not belong to anyone in the residence. The gloves looked like what ATF observed the suspects wearing during the crime.

10

34.     On October 19, 2022, a criminal complaint was filed against CUSTIS and BRYANT in the District of Kansas.

**B.     Recovery of Additional Stolen Firearms in Independence, Missouri**

35.     On October 19, 2022, at approximately 1:27 p.m., Independence, Missouri Police Department ("IPD") officers responded to a shooting at 301 East Fair Street, Independence, Missouri. The caller advised that a male had been shot multiple times by a black male who fled the scene in a black 2012 Chevrolet Equinox SUV. Additional 911 callers informed officers the suspect was the victim's son.

36.     While IPD officers were responding to the shooting, another IPD officer arrived at a fresh motor vehicle crash involving a black SUV. An involved party told officers the driver of the black SUV, later identified as Tayvion HOWARD, had a bag and a gun. As officers observed HOWARD standing at the front passenger door of the crashed black SUV, HOWARD fled with a multicolored backpack. Officers began to chase HOWARD and noticed a handgun hanging out of his pocket. HOWARD was eventually taken into custody.

37.     The black SUV HOWARD was driving was reported stolen on October 15, 2022. Officers also observed a spent shell casing in plain view on the front passenger floorboard and a price tag for a firearm in plain view on the front passenger seat. Officers recovered the following items on the ground outside of the vehicle:

    a.      A nine-millimeter IMC, semi-automatic handgun bearing serial number BA469264, stolen from Up in Arms in De Soto, Kansas.

    b.      A nine-millimeter Glock brand, semi-automatic handgun bearing serial number BTNW729, stolen from Free State Gun Company in Basehor, Kansas.

    c.      A nine-millimeter Glock brand, semi-automatic handgun bearing serial number BPNC715, reported stolen out of Kansas City, Missouri.

11

38.     Additionally, officers recovered the following items during a search of a multicolored backpack:

      a.    A Rock Island Armory brand, .45-caliber, semi-automatic handgun bearing serial number RIA2484279, stolen from Up in Arms in De Soto, Kansas.

      b.    A Rock Island Armory brand, .380-caliber, semi-automatic handgun bearing serial number RIA2580934, stolen from Up in Arms in De Soto, Kansas.

      c.    A Smith & Wesson brand, .45-caliber, semi-automatic handgun bearing serial number HYF0014, stolen from Up in Arms in De Soto, Kansas.

39.     Officers recovered the following from HOWARD's pants pocket incident to his arrest: a Glock brand, 43 model, nine-millimeter, semi-automatic handgun bearing serial number AFVT574, with one round loaded within the chamber of the firearm, and six rounds loaded within the magazine.

40.     At the shooting scene, IPD officers learned, from witness statements, that HOWARD and the victim were involved in a disturbance at 527 East Devon, Independence, Missouri, and HOWARD shot at the victim. HOWARD fled the scene and the victim followed. The two began chasing each other, with witnesses claiming more shots were fired from one of the vehicles. The vehicles eventually stopped on Dodgion Avenue, and both parties exited their vehicles. Witness said HOWARD then shot the victim three times and fled the scene in his vehicle.

41.     IPD officers obtained a state search warrant for HOWARD's vehicle and recovered one nine-millimeter shell casing, a price tag for a Springfield XDM firearm, and a few documents displaying HOWARD's name. Inventories of the two businesses noted there were a total of five Springfield firearms stolen. Officers also recovered a clear bag containing marijuana and a digital scale.

12

42.     HOWARD was detained in the IPD detention facility. While he was detained, HOWARD made several phone calls which were reviewed by IPD investigators. Most notable were conversations where HOWARD made statements admitting to knowing the vehicle was reported stolen, to knowing the firearms were stolen, and to shooting his father. HOWARD also stated he had just come from Kansas City, Missouri, where he had been selling marijuana, and was in Independence, Missouri, to make some money.

43.     On October 20, 2022, HOWARD stated, during a post-*Miranda* interview, that he purchased the black SUV from his friend, Benjamin CUSTIS, a.k.a. "Lash." When asked about the firearms, HOWARD said CUSTIS had borrowed the car for a couple of days and, when CUSTIS returned the car, the guns were in there. HOWARD stated CUSTIS later called him and told him all the guns in the car were stolen. HOWARD told investigators that he and CUSTIS have another friend in common named Jaden CHANEY (a.k.a., Jaden Deckard, hereinafter "CHANEY"), with a birthday in May 2001, and described him as a light skinned black male with a "mini afro." HOWARD stated that CHANEY stays in a red house at 7900 Virginia Avenue, Kansas City, Missouri, with a Ford Mustang in the driveway. HOWARD stated that, after CUSTIS was in a pursuit with police, CUSTIS called CHANEY and was heading to his (CHANEY's) house. HOWARD said CHANEY told CUSTIS not to come there because he had 190 "stick" that were stolen in his house. Based on my training and experience, I know a "stick" is a street term for a firearm.

44.     HOWARD stated that CHANEY's residence, 7900 Virginia Avenue, Kansas City, Missouri, is where all the firearms stolen from the two FFLs were located. HOWARD stated the firearms were in a suitcase and "ARs, chops, and Dracos," and over 100 handguns and "grenades" were at CHANEY's residence. Based on my training and experience, I know "ARs" is a street term

13

for assault rifles, "chops" is a street term for AK-style firearms, and "Draco" is a street term for a miniature AK-style pistol.

45.     HOWARD stated that he had been to the CHANEY's residence and "they got the guns." He then described CUSTIS, CHANEY, "Marco," and "CJ." HOWARD's description of CUSTIS matches CUSTIS's appearance and his description of CHANEY matches CHANEY's appearance.

46.     HOWARD also referred to the stolen Ford F-150 (the **Target Vehicle**) that was "on the news," and stated that CHANEY and CUSTIS were the ones who "did that." Based on my training, experience, and the context of the conversation, I believe HOWARD is stating that CHANEY and CUSTIS are two of the suspects who burglarized the two FFL businesses.

47.     After the interview was concluded, HOWARD was escorted back to IPD detention, where he was held until formal charges were filed by the Jackson County, Missouri Prosecutor's Office. HOWARD was initially charged with unlawful use of a weapon and tampering with a motor vehicle in Jackson County, Missouri Circuit Court.

48.     After receiving this information, ATF investigators began to research CHANEY's address. Law enforcement databases, which base the information on credit bureau and utility information, listed CHANEY, with a birthday of May 19, 2001, as an individual with utilities / credit bureau information at the address. Investigators obtained CHANEY's Missouri driver's license information and noted that 7900 Virginia Avenue, Kansas City, Missouri, was listed as his residence of record. This address was also listed as CHANEY's residence on multiple police reports.

49.     On October 20, 2022, at around 2:00 p.m., surveillance units drove to CHANEY's residence and noted HOWARD's description of the residence matched their observations of the

14

residence. The residence is red and surveillance units observed a blue, grey, and black Ford Mustang on blocks in the driveway.

50.　　Based on this information, on October 20, 2022, ATF agents obtained and executed a federal search warrant (22-SW-00658-JAM) for 7900 Virginia Avenue, Kansas City, Missouri. CHANEY was not home when the warrant was executed, but family members said CHANEY lived in the basement of the residence. ATF agents located an additional eight firearms in CHANEY's basement room. All eight firearms were reported stolen from Free State Gun Company in Basehor, Kansas.

51.　　Based on my training and experience, I know individuals involved in criminal activity utilize mobile telephones to facilitate crimes. Specifically, I am aware that individuals involved in criminal activity utilize mobile telephones, whether through telephone conversations or text messages, as a medium to communicate with coconspirators during the planning and commission of crimes, particularly the distribution of controlled substances. For instance, HOWARD stated CUSTIS called HOWARD and CHANEY several times after the FFL robberies to communicate his location and plans.

52.　　I believe that some of the mobile telephones used by the suspects remain active or, even if inactive, may still be found in the **Target Vehicle**. I know, based on my training and experience, that drug and firearm traffickers commonly maintain their mobile telephones in their vehicles, at their residences, or on their persons.

53.　　Based on my training and experience, I know that mobile telephones may be important to a criminal investigation because mobile telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crime in the form of electronic data. Specifically, mobile telephones frequently contain electronic data that constitutes evidence of criminal activity. The following are examples of how mobile telephones are

15

commonly used to facilitate firearms and drug trafficking activity and how electronic data stored within the mobile telephones commonly constitute evidence of criminal activity:

a.     A mobile telephone can act as a wireless telephone, which is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; and storing dates, appointments, and other information on personal calendars. Electronic address books frequently reveal the identities of criminal associates and the telephone numbers that the criminal associates maintain.

b.     A mobile telephone can act as a personal digital assistant ("PDA"), which is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes). PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Names and addresses stored within PDAs frequently pertain to criminal associates or locations where drug traffickers conduct their criminal activity. Appointments and other notes also frequently pertain to drug and firearm trafficking activity conducted by the user of the telephones.

c.     A mobile telephone can act as a digital camera, which is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images.

16

Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Most digital cameras also include a screen for viewing the stored images. Drug and firearm traffickers often take still photographs and videos of themselves and their associates while engaged in criminal activity or with the proceeds of criminal activity and maintain these photographs and videos on their mobile telephones.

        d.      A mobile telephone can send SMS messages (or "text messages") and e-mails. SMS messages are communications sent between mobile telephone users. SMS messages and e-mails may be stored on a mobile telephone. These communications frequently pertain to criminal activity.

        e.      A mobile telephone can also contain applications, which allow communication between users of mobile telephones other than by a conventional telephone call, text message, or e-mail. Drug and firearm traffickers often communicate with applications that use end-to-end encryption to avoid interception of the communications by law enforcement. Examples of applications with end-to-end encryption that drug and firearm traffickers commonly use to communicate include WhatsApp, FaceTime, TextNow, and Facebook Messenger.

### TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

54.      Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

a.    Many modern motor vehicles are equipped with sensors, cameras,[2] transmitters, and electronic control units ("ECUs")[3] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[4] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

b.    Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

c.    A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System ("GPS")

---

[2] As of 2018, the U.S. National Highway Traffic Safety Administration ("NHTSA") requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

[3] "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

[4] The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders ("EDRs") or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, NHTSA adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

       d.     A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

       e.     The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

       f.     The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless

19

telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

g.      I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h.      As previously stated, the **Target Vehicle** is a white 2022 Ford F-150. To complete a forensic extraction from the **Target Vehicle**, it may be necessary, temporarily, to remove trim and other components of the **Target Vehicle** to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the **Target Vehicle**. In the event that potentially destructive processes are required to perform this extraction, parts of the **Target Vehicle** may be destroyed and rendered useless. In this particular case, it is not anticipated that significant damage, if any at all, will be caused to the **Target Vehicle**.

i.      Furthermore, it may be necessary to return to the **Target Vehicle** and reconnect the infotainment and telematics systems to the **Target Vehicle's** power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

j.      The requested warrant authorizes a later review of the media and information seized or copied from the **Target Vehicle**, which review may continue past the date required for execution of the warrant.

55.     Based on my training and experience, I am aware that the Heart of America Regional Computer Forensics Laboratory offers vehicle forensics. These systems are designed to store a vast amount of data which may include recent destinations, favorite locations, call logs, contacts, SMS messages, emails, pictures, videos, social media feeds, and the navigation history of where the vehicle has traveled. They may also record vehicle events such as the activation or deactivation of the headlights, the opening and closing of doors, shifting into reverse, hard acceleration, hard braking, velocity, and the location of the vehicle when these things occurred. Imaged rental cars can store the information for multiple users. It is possible to recover a great deal of information off the phones that have been connected to the car without access to the phone itself. This information could place suspects, including CUSTIS, BRYANT, and CHANEY, at the scene of the two FFL burglaries. There are over 10,000 supported vehicles by BMW, Buick, Cadillac, Chevrolet, Chrysler, Dodge, Fiat, Ford, GMC, Hummer, Jeep, Lincoln, Maserati, Mercedes, Mercury, Pontiac, Ram, Saturn, Toyota, and Volkswagen. The **Target Vehicle** is equipped with an infotainment system which is installed within the center console / dashboard and may contain the information listed previously in this paragraph.

21

56.     Based on the foregoing, I believe that the **Target Vehicle** will contain additional evidence of violations 18 U.S.C. § 922(u), that is, knowing theft of firearms from a federal firearms licensee; and 18 U.S.C. § 922(j), that is, receipt or possession of a stolen firearm. Based on the foregoing, I have probable cause to believe and do believe there is probable cause to request that the Court issue a search warrant directing the search of the **Target Vehicle** further described in Attachment A for the items described in Attachment B, which are contraband or evidence, or are otherwise used to facilitate or promote, or which constitute proceeds of the crimes listed above.

## **CONCLUSION**

57.     I submit that this affidavit supports probable cause for a warrant authorizing the extraction and forensic examination of electronically stored information within the **Target Vehicle** (as described in Attachment A) to seize the data described in Attachment B. Furthermore, I expect to find the evidence, fruits, instrumentalities, and contraband described herein and in Attachment B in the **Target Vehicle**. I request that a search warrant be issued by the court enabling law enforcement officers to make a search of the **Target Vehicle** fully described above.

58.     I further request that the Court order that all papers in support of these applications, including the affidavit, search warrant, search warrant return, and Order granting sealing be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that

investigation. Additionally, it is requested that these documents be disclosed as necessary for any discovery in criminal prosecutions without unsealing.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Elizabeth A. White
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me via telephone or other reliable electronic means on this
28th day of October 2022.   Sworn to by telephone
2:28 PM, Oct 28, 2022

_____
HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri



23